#24717-rev&rem-BROWN, Circuit Judge
**2008 SD 110**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

JEFFREY RAY HEINEMEYER,                    Plaintiff and Appellee,

  v.

HEARTLAND CONSUMERS POWER
DISTRICT, and JERRY MICHEEL,
MERLIN VAN WALLEGHEN, JEAN RAVE,
GARY OLSON, EDWARD LAMERS,
DAN O'CONNOR, MILTON FREIER,
ROGER FRITZ, and RON ANDERSON,
as members of the Board of Directors
of Heartland Consumers Power District,        Defendants and Appellants.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT
OF THE THIRD JUDICIAL CIRCUIT
LAKE COUNTY, SOUTH DAKOTA

\* \* \* \*

HONORABLE VINCENT A. FOLEY
Judge
\* \* \* \*

WILSON KLEIBACKER of
Lammers, Kleibacker & Brown, LLP          Attorneys for plaintiff
Madison, South Dakota                     and appellee.


RICHARD D. CASEY and
RYLAND DEINERT of
Lynn, Jackson, Shultz & Lebrun, PC         Attorneys for defendants
Sioux Falls, South Dakota                  and appellants.

\* \* \* \*

CONSIDERED ON BRIEFS
ON MAY 19, 2008

OPINION FILED 11/12/08

#24717

BROWN, Circuit Judge

[¶1.]     Heartland Consumers Power District (Heartland) appeals from an order and writ of mandamus finding that Jeffrey Ray Heinemeyer (Heinemeyer) was legally qualified to serve on the Heartland Consumers Power District Board of Directors (the Board) and requiring the Board to seat Heinemeyer on the Board. We reverse and remand.

FACTS AND PROCEDURAL HISTORY

[¶2.]     Heartland is a public corporation and political subdivision of the State of South Dakota, with headquarters in Madison, South Dakota. Heartland is organized pursuant to the Consumers Power District Law, SDCL chs 49-35 to 49-40, inclusive. Heartland is divided into ten subdivisions and covers a geographic area that stretches across most of the eastern half of South Dakota. Pursuant to SDCL ch 49-36, Heartland's directors are elected by the voters of their respective subdivisions and serve a term of six years. Subdivisions 1 through 9 consist exclusively of rural areas and do not include any municipalities. Subdivision 10 of Heartland, however, consists exclusively of the municipalities of Groton, Volga, and Madison, South Dakota.

[¶3.]     In 2006 two candidates filed for the board position representing Subdivision 10: the incumbent, Anita Lowary, the City Finance Officer of Groton, and Heinemeyer, the City Finance Officer of Madison. Heinemeyer won the general election on November 7, 2006, receiving sixty percent of the vote for the director position from Subdivision 10.

[¶4.]     Prior to November 1, 2006, Heinemeyer had been living in a house that he owned at 927 Jennifer Street in Madison. He sold the home during the fall of

2006 and turned over possession of the home to the buyers on November 1, 2006. On that same day, Heinemeyer moved out of the home on Jennifer Street and began staying at a new home he built east of Lake Madison, on Round Lake, at the address 27 Golf Drive, Wentworth, South Dakota. Heinemeyer's new home is located in Subdivision 8 of the Heartland Consumers Power District rather than Subdivision 10. Heinemeyer officially closed the sale of his house at 927 Jennifer Street on November 16, 2006.

[¶5.] On November 17, 2006, ten days after the election, Heinemeyer began sharing a one-bedroom apartment in downtown Madison, at the address 107 North Egan, Apartment 4, for $75 per month. At that time, the apartment was being rented by an acquaintance of Heinemeyer named Lonnie Lembke. Further, on January 3, 2007, Heinemeyer changed his voter registration, listed his "residence address" as 107 N. Egan, Apt. 4 in Madison, and declared that he maintained his home at that address.

[¶6.] On December 19, 2006, Heartland's attorney notified Heinemeyer that the Board did not intend to seat him at their next regular meeting scheduled for January 9, 2007, because Heinemeyer moved his residence from Subdivision 10 to Subdivision 8. On December 28, 2006, Governor M. Michael Rounds executed a Certificate of Election for Heinemeyer declaring he was elected to the office of Heartland Consumers Power District, representing District 10 for a term of six years beginning January 1, 2007. Secretary of State Chris Nelson attested to the certificate. Subsequently, on January 4, 2007, Heinemeyer's attorney notified Heartland's attorney by letter of his demand that Heinemeyer be allowed to be

sworn in as a member of the board at its January 9, 2007, meeting. At the January 9, 2007, meeting the Board voted unanimously not to seat Heinemeyer as a director of Subdivision 10 because he had moved his residence from Subdivision 10 to Subdivision 8.

[¶7.] Heinemeyer filed this action against Heartland in the Third Judicial Circuit claiming he was improperly removed as an elected director of the Heartland Consumers Power District - Subdivision 10. Following a court trial, the court found that Heinemeyer was legally qualified to serve on the Board. It filed an order and writ of mandamus requiring the Board to seat Heinemeyer. Heinemeyer was subsequently seated as a Heartland director in compliance with the order and writ, and Heartland and its individual board members now appeal that ruling to this Court.

[¶8.] Heinemeyer filed a motion to dismiss this appeal because the Board did not have a quorum to authorize the appeal. On February 22, 2008, this Court entered an order denying Heinemeyer's motion to dismiss. In his brief Heinemeyer renews his motion to dismiss this appeal, but does not raise additional grounds for his motion. We find no reason to revisit Heinemeyer's motion to dismiss and the February 22, 2008, order stands.

### STANDARD OF REVIEW

[A] writ of mandamus is an extraordinary remedy that will issue only when the duty to act is clear [.]" Baker v. Atkinson, 2001 SD 49, ¶ 16, 625 NW2d 265, 271. "It commands the fulfillment of an existing legal duty, but creates no duty itself, and acts upon no doubtful or unsettled right." Sorrels v. Queen of Peace Hosp., 1998 SD 12, ¶ 6, 575 NW2d 240, 242. To prevail, "the petitioner must have a clear legal right to performance of

the specific duty sought to be compelled and the respondent must have a definite legal obligation to perform that duty." *Id.* The standard of review for the grant or denial of a writ of mandamus is abuse of discretion. Schafer v. Deuel County Bd. of Comm'rs, 2006 SD 106, ¶ 4, 725 NW2d 241, 243.

Woodruff v. Bd. of Com'rs Hand County, 2007 SD 113, ¶ 3, 741 NW2d 746, 747.

This case, however, is dependent upon the interpretation of statutes. "Statutory interpretation and application are questions of law." Block v. Drake, 2004 SD 72, ¶ 8, 681 NW2d 460, 463 (citing Steinberg v. State Dep't of Military Affairs, 2000 SD 36, ¶ 6, 607 NW2d 596, 599). This Court reviews questions of law under the de novo standard with no deference afforded the circuit court's decision. *Id.*

ANALYSIS AND DECISION

[¶9.]     **Whether the circuit court erred in ruling that Heinemeyer is a resident of Subdivision 10 of Heartland Consumers Power District, and is therefore legally qualified to serve as a director from that subdivision.**

[¶10.]     The principles of statutory construction are well founded:

'The purpose of statutory construction is to discover the true intention of the law which is to be ascertained primarily from the language expressed in the statute.' Esling v. Krambeck, 2003 SD 59, ¶ 6, 663 NW2d 671, 675-76 (citation omitted). When interpreting a statute, we give plain meaning and effect to words and phrases. Hay v. Bd. of Comm'rs for Grant County, 2003 SD 117, ¶ 9, 670 NW2d 376, 379 (citing Esling, 2003 SD 59, ¶ 6, 663 NW2d at 676 (citing Moss v. Guttormson, 1996 SD 76, ¶ 10, 551 NW2d 14, 17 (citations omitted))). We view the language of the statute as a whole, "'as well as enactments relating to the same subject.'" *Moss,* 1996 SD 76, ¶ 10, 551 NW2d at 17 (quoting U.S. West Communications, Inc. v. Public Utilities Com'n of State of S.D., 505 NW2d 115, 122-23 (SD 1993)).

*In re* Montana-Dakota Utilities Co., 2007 SD 104, ¶ 10, 740 NW2d 873, 877.

[¶11.]     SDCL chs 49-35 through 49-40, inclusive, govern consumers power

districts.  SDCL 49-36-11 provides:

> No person shall be qualified to hold office as a member of
> the board of directors of a consumers power district unless
> he or she shall be a *voter* of such district or, if such district
> be subdivided for election purposes as provided in this
> chapter, *of the subdivision of which he or she shall be a
> voter*.  No person shall be qualified to be a member of
> more than one such district board.

(Emphasis added.)  In other words, a member of a consumers power district who

serves on the board of directors must be a voter of the district.  Furthermore, if the

district is subdivided, then the member must be a voter of the subdivision which he

or she is elected to represent.

[¶12.]     While SDCL ch 49-36 does not further define the term "voter," SDCL

12-4-1 provides that every person who is qualified to register as a voter in South

Dakota "shall be entitled to be registered as a voter in the voting precinct in which

he *resides*."  (Emphasis added.)  SDCL 12-1-4[1] delineates the criteria for

---

1.     In its memorandum decision, which was incorporated into its findings of fact
       and conclusions of law, the circuit court noted that "SDCL § 12-1-4 sets forth
       *criteria* for determining a voting residence.  There is no set definition for
       'voting residence' as it is to be determined by examining all surrounding facts
       & [sic] circumstances of the case." (Emphasis in original).  By emphasizing
       the word "criteria" it appears the circuit court intended to minimize the
       language of SDCL 12-1-4 and, in fact, the remainder of the circuit court's
       analysis does not mention or consider SDCL 12-1-4.  To the contrary, the
       plain language of SDCL 12-1-4 provides clear direction to determine a
       person's voting residence.  "When determining legislative intent, 'we assume
       no part of its statutory scheme be rendered mere surplusage.'"  Huber v.
       Dept. of Public Safety, 2006 SD 96, ¶ 14, 724 NW2d 175, 179 (citing Double
       Diamond Const. v. Farmers Co-op. Elevator Ass'n of Beresford, 2003 SD 9, ¶
       7, 656 NW2d 744, 746).  Furthermore, there is no statute in SDCL Title 12
       that directs that voting residence is to be determined by all the facts and
       circumstances surrounding the person.  "When interpreting a statute, this
       Court must seek the true intention from the language used and *cannot supply*

determining voting residence. It provides:

> For the purposes of this title, the term, residence, means the place in which a person has fixed his or her *habitation* and to which the person, whenever absent, intends to return.
>
> A person who has left home and gone into another state or territory or county of this state for a temporary purpose only has not changed his or her residence.
>
> A person is considered to have gained a residence in any county or municipality of this state in which the person *actually lives*, if the person has no present intention of leaving.
>
> If a person moves to another state, or to any of the other territories, with the intention of making it his or her permanent home, the person thereby loses residence in this state.

(Emphasis added.) In other words, a voting residence is the place in which a person has "fixed his or her habitation" and "whenever absent, intends to return." *Id.* Furthermore, a person gains voting residence in the place in which he or she "actually lives" and "has no present intention of leaving." *Id.*

[¶13.]      Finally, SDCL 49-36-6 provides that "[a] vacancy on the board of directors shall exist in the event of the . . . [r]emoval from the subdivision from which the director was elected." While there is no statutory definition of the term "removal," the general meaning of the word is "[t]he transfer or moving of a person or thing from one location, position, or residence to another." Black's Law Dictionary 1332 (8th ed 2004); *see also* Premier Bank, N.A. v. Mahoney, 520 NW2d

---

*words in the statute.*" In re Yanni, 2005 SD 59, ¶ 15, 697 NW2d 394, 400 (citing Boehrs v. Dewey County, 74 SD 75, 79, 48 NW2d 831, 833-34 (1951)(emphasis added)). SDCL 12-1-4 provides clear criteria to determine a person's voting residence.

894, 896 (SD 1994) (citing Webster's New World Dictionary of the American Language 506 (rev ed 1975) ("The general meaning of the word 'removed' is, 'to move (something) from where it is; take away or off . . . to move away, as to another residence[.]'). Indeed, applying the common definition of removal in this case envisions moving oneself to a different residence.

[¶14.] Considering these statutes, *in pari materia*, we address the uncontroverted facts of this case. Prior to November 1, 2006, Heinemeyer was living at his home at 927 Jennifer Street in Madison, South Dakota. Since this was the only residence Heinemeyer kept at the time, this was in fact his voting residence. On November 1, 2006, Heinemeyer relinquished possession of his home at 927 Jennifer Street to the purchasers of that home and moved to the new home he built at 27 Golf Drive in Wentworth, South Dakota. On November 1, 2006, Heinemeyer ceased to actually live in his home in Madison. Heinemeyer effectively *gained* voting residence at his home in Wentworth on November 1, 2006, because he began actually living in his Wentworth home. Thus, on November 1, 2006, Heinemeyer removed himself from District 10 and established his voting residence at 27 Golf Drive in Wentworth.

[¶15.] On November 17, 2006, Heinemeyer began sharing a one-bedroom apartment in downtown Madison, at the address 107 N. Egan, Apt. 4, for $75 per month. The question then becomes: did Heinemeyer regain his voting residence in Madison by renting the apartment? The answer is clearly no. Heinemeyer argues that he intended to make his voting residence within the municipality of Madison. However, "[a] person's declared intentions may be discounted when they conflict

with the facts." State ex rel Jealous of Him v. Mills, 2001 SD 65, ¶ 10, 627 NW2d 790, 793 (citations omitted).

[¶16.]     Heinemeyer does not actually live in his apartment in Madison. During his testimony, Heinemeyer acknowledged that he does not spend any substantial amount of leisure time at his apartment, keeps few, if any, personal effects at the apartment, and rarely sleeps there overnight. Furthermore, while Heinemeyer testified that he obtained the apartment in order to have a place to eat lunch during the workday and occasionally take naps, he also admitted that he began renting the apartment to satisfy the residency requirement in order to serve on the Board. It is clear that Heinemeyer actually lives in his home in Wentworth and that he has no present intention of leaving.

[¶17.]     The circuit court found that "[a]lthough he built a house on Lake Madison where he currently sleeps, he performs all other activities in Madison and those activities show his *intention to keep Madison as his legal voting residence*." (Emphasis added.) In its analysis the circuit court noted several facts that indicate Heinemeyer's intention to keep Madison his voting residence:

> a. voting as a registered voter in Madison for several years;
> b. attending church regularly in Madison;
> c. maintaining membership on the Chamber of Commerce;
> d. volunteering on city and community boards;
> e. renting an apartment in Madison;
> f. maintaining his mailing address in Madison;
> g. using his Madison address as his bank address;
> h. receiving newspapers in Madison; and
> i. daily employment duties.

[¶18.] While these facts certainly establish Heinemeyer's strong ties and service to the community of Madison, they do little to aid in the evaluation of where he actually lives and whether he has any present intention of leaving. *See* SDCL 12-1-4. To evaluate Heinemeyer's voting residence under the guise of where Heinemeyer wants his voting residence to be ignores the clear statutory language of SDCL 12-1-4. The proper question is not where Heinemeyer intends his voting residence to be, but whether Heinemeyer has any present intention of leaving the home in Wentworth, where he *actually lives*. The record is clear that Heinemeyer has no present intention of leaving his home in Wentworth. To hold otherwise would depart from the clear language the legislature has provided in such circumstances.

[¶19.] The fallacy of Heinemeyer's argument is most easily demonstrated by considering the situation, not entirely unlikely, of an individual who lives and has been a voting resident outside of the municipal limits of a community but went to school in the municipality, goes to church, is employed, serves on the chamber and various community boards and organizations, does his banking, receives his mail and takes his lunch in the municipality. In all respects, such an individual exhibits all of the substantial ties to the municipality shown by Heinemeyer, except being a registered voter of the municipality. If that individual, while maintaining his house outside the municipal limits where he returns in the evenings and keeps his personal belongings, took an efficiency apartment in the municipality as a matter of workday convenience we would have little difficulty in determining that he did not actually live in the municipality for purposes of establishing voter residency.

[¶20.] The Nebraska Supreme Court, on very similar facts, upheld a candidate's removal from the board of a natural resources district where the candidate changed his residence to an address outside the district, but declared his intention to maintain his voting residence in the district at a home occupied by his aunt and uncle that he intended to purchase at some unspecified future date. Krajicek v. Gale, 267 Neb 623, 677 NW2d 488 (2004). A 1984 South Dakota Attorney General's opinion came to a similar conclusion. *See* 1984 SD OpAttyGen 19 (opining that an individual who has a place of business, within the corporate limits of a municipality, and which place of business has a one-room apartment, may not be permitted to register and vote as though the individual was a resident of that municipality when, in fact, the individual has an ordinarily recognized place of residence outside the corporate limits of said municipality).

[¶21.] Heinemeyer has not demonstrated a clear legal right to be seated on the Board. Indeed, because Heinemeyer has not gained voting residence in Subdivision 10, the Board had no existing legal duty to seat Heinemeyer as a director of Heartland and the circuit court abused its discretion by granting the writ of mandamus. Accordingly, the circuit court order granting the writ of mandamus is reversed and remanded for proceedings consistent with this opinion.

[¶22.] KONENKAMP and ZINTER, Justices, concur in result.

[¶23.] GILBERTSON, Chief Justice, and MEIERHENRY, Justice, dissent.

[¶24.] BROWN, Circuit Judge, for, SABERS, Justice, disqualified.

ZINTER, Justice (concurring in result)

[¶25.] In my view, "removal" under SDCL 49-36-6(2) is ultimately determined by a person's domicile rather than a person's "voting residence." Although a person's domicile and residence are usually the same, the two are not synonymous. The law recognizes that a person may have more than one residence but only one legal domicile. Because the only reasonable view of the facts reflects that Heinemeyer changed his domicile when he sold his old home in Madison and moved to his new rural home near Wentworth, that move constituted a removal from Subdivision 10, creating a vacancy under SDCL 49-36-6(2). I therefore concur in result.

[¶26.] Both the lead opinion and the dissent focus on Heinemeyer's "voting residence," "voter registration," and status as a "voter" under various election statutes in SDCL Title 12.[2] The dissent suggests "the question before this Court is much larger and more complicated than whether or not the Board was entitled to refuse to seat Heinemeyer." *Infra,* ¶36. "Instead, [the dissent suggests] we must ask . . . did Heinemeyer maintain a voting residence and his right to vote in Madison, South Dakota, elections, such that he was duly elected by the voters of Madison to the Subdivision 10 seat and never vacated that seat." *Id.* The dissent

_____

2. The lead opinion and dissent analyze SDCL 12-1-4, which defines "voting residence," but only for purposes of SDCL Title 12. *See* SDCL 12-1-4 (defining voting residence "for purposes of this title [Title 12]"). The lead opinion and dissent also analyze SDCL 49-36-1 and 49-36-11, which prescribe voting residency qualifications for the election of district directors. None of these provisions indicate when a director has *removed* himself from a subdivision within the meaning of SDCL 49-36-6(2).

even suggests this is a matter of overturning the will of the voters under the South Dakota Constitution.[3]

[¶27.]     Heartland's board of directors, however, did not challenge Heinemeyer's voting residence or qualifications under the South Dakota Constitution, Title 12, or SDCL 49-36-1 and 49-36-11 when Heinemeyer ran for director of Subdivision 10 at the November 2006 election. Indeed, there is no dispute that Heinemeyer remained registered to vote in Subdivision 10 through the November 2006 election. Further, following the election, there was no challenge to Heinemeyer's certificate of election to the office of Heartland Consumers Power District, representing District 10, for the six-year term beginning January 1, 2007. The board only later refused to seat Heinemeyer, contending that a vacancy occurred because he had *removed* himself from Subdivision 10. *See* Stipulation of Facts #15, and SDCL 49-36-6(2), which provides that "[a] vacancy on the board of directors shall exist in the event of the [r]emoval from the subdivision from which the director *was elected*." (Emphasis added.)

[¶28.]     Therefore, we need only determine whether, by moving from his old home in Subdivision 10 to his new home in Subdivision 8, Heinemeyer removed himself from Subdivision 10. Ultimately, as is explained below, this only presents

---

3.     The dissent suggests that we are concerned with a significant public question concerning the "protection" of our citizens' "voting franchise" under the South Dakota Constitution. *Infra,* ¶¶38, 43. It is, however, quite clear that South Dakota Constitution Art VII, § 2 only governs the right to *vote* on *elections* and *questions submitted* to the *voters* of the state. The Constitution does not purport to regulate when a director has removed himself from a subdivision within the meaning of SDCL 49-36-6(2).

us with the question of Heinemeyer's domicile following his move to his new home: a question in which voter registration is only one factor. *See infra* ¶30.

[¶29.]     As the lead opinion observes, there is no statutory definition of the term "removal" in SDCL 49-36-6(2). Therefore, we must look to the plain and ordinary definition of that word. As the lead opinion further observes, Black's Law Dictionary defines "removal" as "[t]he transfer or moving of a person or thing from one location, position, or residence to another." Black's Law Dictionary 1344 (8th ed 2004).

[¶30.]     Although this dictionary definition uses a generic reference to moving one's residence, the precise term for legal purposes is domicile. As we recognized in *In re* Estate of Galada, 1999 SD 21, ¶12, 589 NW2d 221, 223:

> No one can have more than one domicile at a time. We have said "domicile is established by physical presence in a place in connection with a certain state of mind concerning one's intent to remain there." "Domicile is the place with which a person has a settled connection for certain legal purposes, either because his home is there or because that place is assigned to him by law."

(citations omitted). Thus, "'[d]omicile' does not carry the same meaning as 'residence.' 'Residence' signifies living in [a] particular locality while 'domicile' means living in that locality with intent to make it a fixed and permanent home." People In Interest of G.R.F., 1997 SD 112, ¶16, n4, 569 NW2d 29, 33 (citing Black's Law Dictionary 485 (6th ed 1990)). This means that "one can reside in one place but be domiciled in another." *Id.* ¶16, 569 NW2d at 33 (citing the common-law principles discussed in Mississippi Band of Choctaw Indians v. Holyfield, 490 US 30, 48, 109 SCt 1597, 1608, 104 LEd2d 29 (1989)). But, "[w]hen the domicile of a

party is in doubt, a proper determination requires evaluation of all the surrounding circumstances[,]" only one of which is a person's voter residence. State ex rel. Jealous of Him v. Mills, 2001 SD 65, ¶10, 627 NW2d 790, 793. Further, although a person's intent is an essential element of domicile, "a person's declared intentions may be discounted when they conflict with the facts." *Id.*

[¶31.] Although the facts of this case have been discussed in the other opinions, a number of additional stipulated and undisputed facts must be mentioned. First, there is no dispute that Heinemeyer moved himself and his physical possessions from his old home in Madison to his new rural home on a golf course near Wentworth. That new home is about twelve to fifteen miles from Madison. Further, the parties stipulated that Heinemeyer's prior home in Madison was a three-bedroom, 2,700 square foot structure he sold for $165,000. His new home is a four-bedroom, 3,400 square foot structure he built for $270,000 (plus $50,000 for land acquisition). In comparison, after reviewing the photographs, it is difficult to charitably describe Heinemeyer's $150 per month, one-bedroom, upstairs apartment that he shared with an unrelated acquaintance and co-tenant. Furthermore, under that sharing arrangement, Heinemeyer conceded that he "typically" was "not there [at the apartment] overnights": he conceded that the co-tenant spent most nights there. In fact, Heinemeyer conceded that he had no bed and *had spent less than ten nights at the apartment.*[4] Thus, the circuit court specifically found that Heinemeyer "currently sleeps" in his Wentworth home, a finding that Heinemeyer has not challenged on appeal.

---

4. Heinemeyer testified that he had used a fold-out couch.

[¶32.] Additionally, when shown photographs of the contents of the apartment, Heinemeyer disclaimed ownership of any of the personal property, excepting only a table, some limited clothing, dishes, soap, and a towel. When asked what prompted him to go to such an apartment, Heinemeyer indicated: "I am either working [at my job in Madison] or might have an event to go to [in Madison]." He further indicated that he obtained the apartment partly to try and satisfy the residence requirement for serving on the board, "and [he] wanted to have a place *during the day*." He admitted, however, that when not working, most of his time was spent at his Wentworth home. And, he never testified that the apartment was his fixed and permanent home where he intended to remain. On the contrary, when he entertained, he did so at his Wentworth home and not the apartment. Likewise, his Wentworth home was the place for his family. Heinemeyer indicated that he was divorced and one of the reasons he built the Wentworth home was to make it more attractive for his children to come and spend time with him. He also indicated that his fiancée had been at the apartment fewer than ten times. He finally indicated that for purposes of real estate tax assessment, he filed a "Certificate of Owner-Occupied Dwelling" on his Wentworth home.

[¶33.] In my judgment, the only reasonable view of these facts indicates that when Heinemeyer built and moved to his new home, he established his domicile there rather than his limited use apartment that was used only for his daytime convenience and to get around the removal statute. Although Heinemeyer did

indicate he did not intend to leave the Madison *community*,[5] that was not the relevant inquiry. His domicile was the relevant question and the uncontested facts rather obviously establish that his new home became his domicile. After all, Heinemeyer did not challenge the circuit court's finding that he sleeps in the Wentworth home, and there is no dispute that he did not even have a bed in the Madison apartment. Under the totality of the facts, Heinemeyer is asking the courts to ignore reality. We should not do so.[6]

[¶34.] For the foregoing reasons, Heinemeyer established a new domicile when he sold his home in Madison and moved to his new home near Wentworth. Therefore, no matter where his voting residence or voting registration, and notwithstanding his intent to remain a part of the Madison community, Heinemeyer removed himself from the subdivision from which he was elected.

[¶35.] KONENKAMP, Justice, joins this concurrence in result.

GILBERTSON, Chief Justice (dissenting)

[¶36.] I respectfully dissent. The lead author's conclusion that Heinemeyer gained voting residence at the home in Wentworth on November 1, 2006, is not supported by the facts of this case, or the relevant law. Moreover, the question

---

5. As the lead opinion points out, the circuit court erred as a matter of law in focusing on Heinemeyer's ties with the Madison *community*. *See supra* ¶¶17-19. The dissent does not consider this fundamental error. I join paragraph nineteen of the lead opinion's opinion discussing why Heinemeyer's Madison *community* ties are not relevant in a case like this where Heinemeyer's new home is outside the Madison municipal boundaries but in the Madison community.

6. The dissent's result is premised on its view that Heinemeyer was only "*temporarily* absent from [his Madison apartment] when at work or at his Wentworth residence." *Infra* ¶65. From my perspective, there is no *evidence* to support such a view of the uncontested facts.

before this Court is much larger and more complicated than whether or not the Board was entitled to refuse to seat Heinemeyer. Instead, we must ask, as did the circuit court below, at all relevant times herein did Heinemeyer maintain a voting residence and his right to vote in Madison, South Dakota, elections, such that he was duly elected by the voters of Madison to the Subdivision 10 seat and never vacated that seat. Otherwise, we have the potential of disenfranchising not only Heinemeyer, but also the sixty percent of the Subdivision 10 registered voters who elected him to that position, without a full and fair review of their right to have their votes counted.

[¶37.]       We have a strong preference for preserving election results that are "a free and fair expression of the will of the voters." *In re* Election Contest as to Watertown Special Referendum Election of October 26, 1999, 2001 SD 62, ¶9, 628 NW2d 336, 339; SDCL 12-19-34.[7] This Court has previously held when faced with voting irregularities under an election contest that "'a free and fair expression of the will of the voters should not be overturned due to the mistakes or neglect of an election official.'" *Id.* (quoting Becker v. Pfeifer, 1999 SD 17, ¶27, 588 NW2d 913, 920).

[¶38.]       While this is not an election contest, the same principals apply whenever we consider whether to overturn the will of the voters. The members of the Heartland Consumers Power District Board appear to have waited until after

---

7.    SDCL 12-19-34 provides: "No mere informality in the matter of carrying out or executing the provisions of this chapter shall invalidate the election or authorize the rejection of the returns thereof, and the provisions of this chapter shall be liberally construed for the purposes herein expressed or intended."

the election was certified to attempt to deny Heinemeyer a seat. Given that the Board was aware that Heinemeyer had moved from his prior residence on Jennifer Street in Madison and closed on the Wentworth home before the election, any contest of Heinemeyer's eligibility to run for office should have been made at that time in order to provide voters with the opportunity to cast their vote accordingly. To permit the Board to wait until after the election to oust Heinemeyer is to overturn a "free and fair expression of the will of the voters" of the Heartland Consumers Power District.

[¶39.] There are a few additional facts overlooked by the lead author's writing that are critical to the outcome of this case. First, Heinemeyer testified he moved out of the Jennifer Street residence to convenience the purchasers. Heinemeyer did stay at the Wentworth residence during the sixteen days prior to the official closing on the Jennifer Street residence, and the next day rented the apartment in downtown Madison known as 107 North Egan, Apartment 4. Heinemeyer changed his voter registration on January 3, 2007, declaring his residence address as 107 North Egan, Apartment 4 in Madison. There is nothing in the record to reflect any intent on Heinemeyer's part to make the Wentworth property his address for voter registration purposes.

[¶40.] Also overlooked was Heinemeyer's sworn testimony that he had slept overnight in the apartment for several nights between November 17, 2006, and March 27, 2007, the date on which his deposition was taken in this matter. When asked at the deposition and at trial to quantify the number of nights, Heinemeyer testified it was less than ten, but could not be more specific

[¶41.]    In addition, trial testimony that Heinemeyer kept personal property at the North Egan apartment was also not factored into the lead author's writing. Personal property kept at the apartment by Heinemeyer included a dining table and chairs, clothing such as sports coats and dress shirts, and kitchen items such as plates and silverware.  The fact that Heinemeyer, and only Heinemeyer, paid all utilities beginning in November 2006, and had paid all rent for the apartment beginning in January 2007 through the trial date in August 2007, is also relevant, although not discussed in the lead author's writing.

[¶42.]    If Heinemeyer was a "qualified voter of the district" of Subdivision 10 at the time of the election within the meaning of SDCL 49-36-1, the Office of the Secretary of State's certification of Heinemeyer as having been elected to the Board of Heartland Consumers Power District for Subdivision 10 must stand.  If we answer that question in the positive, then the next question becomes did Heinemeyer create a vacancy within the definition of SDCL 49-36-6 by "removal from the subdivision from which the director was elected."  *See* SDCL 49-36-6(2).

### *Heinemeyer was a "qualified voter" during the election and eligible for the Subdivision 10 seat.*

[¶43.]    SDCL 49-36-11 provides:

> No person shall be qualified to hold office as a member of the board of directors of a consumers power district unless he or she *shall be a voter of such district or, if such district be subdivided for election purposes as provided in this chapter, of the subdivision of which he or she shall be a voter.*  No person shall be qualified to be a member of more than one such district board.

(Emphasis added.)  SDCL 49-36-1 further provides who is a "voter of such district" for purposes of a consumers power district election:

> After the selection of the original board of directors of a consumers power district as provided for in chapter 49-35, their successors shall be nominated and elected and shall take office as provided in this chapter. *Qualified voters of the political subdivision or subdivisions whose combined territory composes the territory of a district shall be qualified voters of the district.* The nomination and election shall be by separate nonpartisan ballot. The term of each member of the board thus elected shall be six years and until his successor is elected and qualified.

(Emphasis added.) No definition of a "qualified voter" is provided in SDCL Chapter 49-36. Thus, we must turn to the definition of "voter" as provided under SDCL Title 12, and the South Dakota Constitution as to what qualifies a person as a "voter" within the meaning of Chapter 49-36. *See* SDCL 12-1-1.[8]

[¶44.] Our state affords great protection to a citizen's voting franchise. SD Const. art. 6, § 19; Duffy v. Mortenson, 497 NW2d 437, 439 (SD 1993) (holding "[i]t is not the policy of the State of South Dakota to disenfranchise its citizens of their constitutional right to vote"). A court must strictly adhere to the constitutional and statutory provisions before disenfranchising a voter. *See* Beinert v. Yankton Sch. Dist., 63-3, 507 NW2d 88, 91 (SD 1993) (holding strict compliance with statutory scheme was properly followed, and this Court would not "disenfranchise voters because election officials chose a specifically prescribed applicable statute over another statute to which they were not directed" as urged by the plaintiff in that case). *Cf.* Becker v. Pfeifer, 1999 SD 17, ¶22, 588 NW2d 913, 919 (holding voters will not be disenfranchised due to an election official's mistakes, negligence, or misconduct, "unless that conduct has been carried to such an extent as to affect the

---

8. SDCL 12-1-1 provides: "The provisions of this title shall apply to all elections for state, district, and county officers and other officers except in cases where from the context of any statute a different intention plainly appears."

true outcome of the election and put the results in doubt[,]" as elevating form over substance when the right to have one's vote counted is at stake is unwarranted).

[¶45.]     The South Dakota Constitution provides in Article 7, Section 2:

> Every United States citizen eighteen years of age or older who has met *all residency and registration requirements* shall be entitled to vote in all elections and upon all questions submitted to the voters of the state unless disqualified by law for mental incompetence or the conviction of a felony.  The Legislature may by law establish reasonable requirements to insure the integrity of the vote.
>
> *Each elector who qualified to vote within a precinct shall be entitled to vote in that precinct until he establishes another voting residence.*  An elector shall never lose his residency for voting solely by reason of his absence from the state.

(Emphasis added.)  The Legislature further defines voting residence in SDCL 12-1-4, which provides:

> For the purposes of this title, the term, residence, means the place in which a person has fixed his or her habitation and to which the person, whenever absent, intends to return.
>
> A person who has left home and gone into another state or territory or county of this state for a temporary purpose only has not changed his or her residence.
>
> A person is considered to have gained a residence in any county or municipality of this state in which the person actually lives, if the person has no present intention of leaving.
>
> If a person moves to another state, or to any of the other territories, with the intention of making it his or her permanent home, the person thereby loses residence in this state.

[¶46.]     In *Treat v. Morris*, 25 SD 615, 127 NW 554, 557 (1910), this Court held that "[a] person who removes from the jurisdiction with the intention of remaining thereby loses his residence, although he afterwards changes his intention and returns; and he cannot vote until he has regained his residence by remaining in the jurisdiction the statutory period."  While reviewed under a prior version of SDCL

12-4-1 that required intent and a period of thirty consecutive days residing in the state to qualify as a voter, the case is instructive in that the person's *intent to remain* is of paramount importance in determining voting residence. *Id.* Removal with intent to remain outside the prior voting district is the triggering event that causes a person to lose his or her original voting residency. *Id.*

[¶47.] In addition to intent, this Court has also stated that a voter's "voting residency" does not change after an actual change of address until such time as the voter's name is removed from the registration lists as provided by statute.[9] Bjornson v. City of Aberdeen, 296 NW2d 896, 902 (SD 1980). This is true even if the voter in question has the intent to remove from one precinct within a county and establish a new residence in another precinct within that same county with the intent to remain at the new residence.[10] Matter of Election Contest as to Reorganization of New Effington Independent School Dist. No. 54-3, 462 NW2d 185, 191-92 (SD 1990). This Court's holding in *New Effington Independent School District* relied on the language of SDCL 12-18-7.1, which provides in relevant part:

---

9.  There are two methods whereby a voter's name can be removed or cancelled from voter registration rolls. First, a voter who moves between states or counties is required to cancel a previous registration under SDCL 12-4-12. Second, a voter who is placed in the inactive registration file and who subsequently fails to vote "by the second general election following the confirmation mailing, the registration shall be cancelled." SDCL 12-4-19.4.

10. While the requirement in SDCL 12-3-4 that a voter must vote in the precinct in which that voter resides was repealed in 1973, the election in the case of *Matter of Election Contest as to Reorganization of New Effington Independent School Dist. No. 54-3*, 462 NW2d 185, 191-92 (SD 1990), turned on whether voters were residents of the school districts involved in the consolidation vote. Precinct registration rolls were used to identify whether voters resided in one of the two school districts involved in that election. *Id.* Only those voters with voting residences in either the Effington School District or the Sisseton School District were permitted to vote in that election. *Id.* at 186-87.

"Any person whose name appears on the precinct registration list may vote at that election." Not until the voter's name is purged from the precinct registration list is "voting residence" destroyed. *Id.*

[¶48.] In the instant case, Heinemeyer physically removed himself from his residence at 927 Jennifer in Madison on November 1, 2006, where he was properly registered to vote in the November 6, 2006, election. At the time of his physical removal from the 927 Jennifer property, it was clear that Heinemeyer had no intention to return and live at that physical location. However, he also testified he had no intention of remaining outside of Madison despite taking up residence at the Wentworth home. He evidenced this intent by his conduct on November 17, 2006. On that date, the day after the sale of his former home at 927 Jennifer closed, Heinemeyer established a residence at the North Egan apartment in Madison.

[¶49.] Heinemeyer's voter registration filed while he resided at 927 Jennifer remained in effect until one of three conditions was satisfied: 1) Heinemeyer moved out of the county and was required under SDCL 12-4-12 to register in his new county of residence; 2) Heinemeyer failed to vote under the conditions provided in SDCL 12-4-19.4; or 3) Heinemeyer changed his voting address by registering to vote under a new address. None of these conditions were satisfied prior to the November 6, 2006, election.

[¶50.] Where Heinemeyer intended to reside, whether at the Wentworth property or at the North Egan apartment, could not at the time of the general election on November 6, 2006, alter Heinemeyer's status as a "qualified voter" for Subdivision 10. Heinemeyer's registration as a voter was based on his prior, valid

Madison residence at 927 Jennifer Street and his name was listed on the precinct role as a properly registered Subdivision 10 voter. Heinemeyer had not removed himself from Lake County and was not required to register in a new county. Finally, his name had not been purged from the precinct registration used for the November 6, 2006, election per SDCL 12-4-19.4.

[¶51.]    Thus, on the date of the election, Heinemeyer was both a "qualified voter" of Subdivision 10, and eligible for the board seat for Subdivision 10 of the Heartland Consumers Power District. Heinemeyer carried sixty-percent of the votes cast for the Subdivision 10 seat, was certified as the properly elected official, and was entitled to retain that seat barring conduct that could result in his removal under SDCL ch 49-36.

***Heinemeyer actions did not create a vacancy for the Subdivision 10 seat to which he was duly and legally elected.***

[¶52.]    The issue we must next consider is governed by SDCL 49-36-6, which provides how a vacancy is created on a consumers power district board of directors and the method for filling that vacancy. SDCL 49-36-6 provides:

> A vacancy on the board of directors shall exist in the event of the
> (1)    Death, disability or removal from district of any directors;
> (2)    Removal from the subdivision from which the director was elected; or
> (3)    Elimination or detachment from the district of the territory in which a director or directors reside.
> In the event of a vacancy, the vacancy shall be filled by the board of directors.

The Board members of the Heartland Consumers Power District sought Heinemeyer's removal under subsection two (2), claiming that Heinemeyer had removed himself from Subdivision 10 to Subdivision 8.

[¶53.] The issue of removal turns on the provisions in SDCL 12-1-4, specifically the first paragraph: "For the purpose of this title, the term, *residence, means the place in which a person has fixed his or her habitation and to which the person, whenever absent, intends to return.*" SDCL 12-1-4 (emphasis added). The third paragraph in SDCL 12-1-4 is also critical to this issue: "A person is considered to have gained a residence in any county or municipality of this state in which the person *actually lives, if the person has no present intention of leaving."* *Id.* (emphasis added).

[¶54.] "This court has decided that '[a] residence is established by personal presence in a fixed and permanent abode, with the intent of remaining there.'" Spurlin v. Siebrasse, 74 SD 150, 152-53, 49 NW2d 604, 605 (1951) (quoting Appeal of Lawrence County, 71 SD 49, 21 NW2d 57, 58 (1945)). "The words 'live' and 'reside' are synonymous. They relate to the domicile or place where the person is deemed in law to reside." Nelson v. Nelson, 71 SD 342, 348, 24 NW2d 327, 331 (1947) (citing Shaw v. Shaw, 98 Mass 158, 1867 WL 5728 (1867); Cover v. Hatten, 136 Iowa 63, 113 NW 470 (1907)).

[¶55.] The facts in the instant case show that Heinemeyer had two fixed permanent abodes beginning November 17, 2006, and continued to maintain both at the time he was scheduled to take the oath of office and his seat on the Heartland Consumers Power District Board. Heinemeyer established a residence at the lake house in Wentworth, a fixed and permanent abode, on November 1, 2006, by removing all his belongings from the Jennifer Street residence and placing them in the Wentworth home and spending all his time away from work at that location

from November 1 through November 16, 2006. However, on November 17, 2006, Heinemeyer established a second residence at the North Egan apartment, another fixed and permanent abode, as evidenced by paying rent and utilities, maintaining personal property, returning on an almost daily basis to the apartment to eat, nap, and shower, and by spending several nights sleeping at the apartment. The question then becomes which of these two residences is Heinemeyer's "voting residence" within the meaning of SDCL 12-1-4.

[¶56.]     Our statutory scheme provides no guidance on how to determine which of two residences maintained by a voter is his or her "voting residence." The only guidance offered under SDCL 12-1-4, in addition to the requirement of a permanent and fixed abode, is the intent of the voter to remain in that abode. This, however, offers no criteria by which to select between two residences.

[¶57.]     Other courts that have been called upon to decide this issue engage in a two-step process whereby the first step determines whether the voter has in fact two residences. *See* People ex rel. Madigan v. Baumgartner, 823 NE2d 1144 (Ill AppCt 2005); Krajicek v. Gale, 677 NW2d 488 (Neb 2004); Dilsaver v. Pollard, 214 NW2d 478 (Neb 1974). After that question is resolved, then the intent of the voter is considered to determine which of the two is the "voting residence." *Baumgartner*, 823 NE2d at 1152; *Dilsaver*, 214 NW2d at 482. *Cf. Krajicek*, 677 NW2d at 495 (lack of physical presence precludes a finding of residence, and thus the second step regarding intent need not be considered).

[¶58.]     As the lead author's writing correctly notes, the plaintiff in *Krajicek*, 677 NW2d at 494, failed to establish that the home of his aunt and uncle was also

his residence in addition to the home Krajicek shared with his wife and children. The Nebraska Supreme Court utilized a two-part factual test to determine whether Krajicek had established residency at one or more locations: "(1) residence, or bodily presence, in that locality and (2) an intention to remain there." The facts reviewed in that case included that Krajicek had won the District 8 seat for the Papio Missouri River Natural Resources District while residing in a home within that district, and subsequently moved to a new home outside that district, and his eligibility to remain in office was then challenged. After removing himself from his home within District 8, Krajicek maintained a home with his wife at 7819 South 45th Avenue, Omaha, Douglas County, Nebraska, an address contained within District 10. However, Krajicek claimed his official residence as his aunt and uncle's home at 4505 Jefferson Street, Omaha, Douglas County, Nebraska, in District 8. He did so by claiming he intended to move into that home at some undesignated time in the future after his aunt and uncle's occupancy. *Id*. at 491-92.

[¶59.] Krajicek paid nothing toward the upkeep of his aunt and uncle's home, rather they paid insurance, utilities, and related expenses on the home. *Id*. at 491. Furthermore, Krajicek returned to his 7819 South 45th Avenue home each night, slept, showered, ate breakfast, left for work and returned from work to that address each night, and maintained all of his personal property at that home. *Id*. That court held that Krajicek had bodily presence at his address in Subdivision 10, but no bodily presence at his aunt and uncle's residence within District 8. *Id*.

[¶60.] The key to that holding was that Krajicek presented "no evidence that he resided at [his aunt and uncle's home at] 4505 Jefferson Street in the sense of

being bodily present at that address." *Id.* Thus, Krajicek was determined not to have established a residence at the home of his aunt and uncles, and therefore, there were not two residences from which to choose a voting residence. That court held that intent alone without bodily presence was insufficient to establish a residence, let alone a voting residence, and thus he had vacated his office representing District 8. *Id.* at 495.

[¶61.]     In sharp contrast to *Krajicek*, is *Dilsaver v. Pollard*, 214 NW2d 478 (Neb 1974), another Nebraska Supreme Court case. In that case, Dilsaver's vote cast in a 1972 Loup County commissioner election was challenged based on voting residence. *Id.* at 481. Dilsaver claimed as his residence a farm in the relevant precinct, which he owned and leased to his son, but upon which he maintained a residence where he had lived since 1923. *Id.* In 1967 Dilsaver remarried a woman who owned a farm in Custer County at which he also spent part of his time. *Id.* at 482. No evidence was presented concerning the amount of time spent at each location, nor was any evidence presented to contradict Dilsaver's expressed intention that his Loup County farm was his residence. *Id.* In deciding that matter, the Nebraska Supreme Court declined to affirm the trial court's judgment which was based on the fact that Dilsaver's wife resided outside Loup County, and a subpoena issued to Dilsaver was returned as properly served at her Custer County farm. *Id.* Instead, that court held that it could not consider the evidence of the service of the subpoena as it was not a part of the record below. *Id.* at 483. Nevertheless, that court held that "[o]ne spouse may have a residence separate from the other," *id.* (citing Wray v. Wray, 31 NW2d 228 (Neb 1948)), and that the

intention of the voter as to his residence prevailed in this case for lack of any other competent evidence to suggest Dilsaver did not maintain a residence within Loup County. *Id.* at 482.

[¶62.]     The issue of how to determine which of two residences is the voting residence was recently reviewed in *Baumgartner*, 823 NE2d at 1147. In that case, the candidate, William Baumgartner, filed a statement of candidacy and won the election for the county board for Moultrie County, Illinois. He was subsequently convicted "of one count of felony perjury for filing a statement of candidacy in which he allegedly falsely stated under oath that his address was in Moultrie County, Illinois[ ]" in violation of section 29-10 of the Election Code (10 ILCS 5/29-10 (West 2002)).[11] *Id.* The conviction resulted in twelve months conditional discharge, a fine of $500.00, and seventy-five hours of community service. *Id.* Baumgartner challenged the conviction on appeal claiming the indictment was void because the statute that makes the offense a felony did not provide due process. *Id.* at 847. Baumgartner challenged the statute alleging it violated his due process rights as the term "residence" was "so ill-defined that the ultimate decision as to its meaning rests on the opinions and whims of the trier of fact rather than any objective criteria or facts." *Id.* at 1149 (quoting Sherman v. Cryns, 786 NE2d 139, 157 (Ill 2003)).

[¶63.]     The state and Baumgartner submitted different usages for the term "residence." *Id.* at 1150. The case turned on the issue of intent and which of two

---

11.     Section 29-10 of the Election Code provides: "Any person who makes a false statement, material to the issue or point in question, which he does not believe to be true, in any affidavit, certificate[,] or sworn oral declaration required by provision of the [Election] Code shall be guilty of a Class 3 felony." *Baumgartner*, 823 NE2d at 1149 (quoting 10 ILCS 5/29-10 (West 2002) (alterations in original)).

residences the candidate intended as his "voting residence." *Id*. The state argued

that Baumgartner exhibited more intent to make his permanent or voting residence

in Champaign, Illinois, where he attended undergraduate and graduate school for a

period of approximately ten years, was married, purchased a home, and began

raising his family. Baumgartner argued that he never gave up his Moultrie County

residence, as he had purchased an 86.7 acre farm with a cousin, acquired his

grandfather's home in Moultrie County, and returned to Moultrie County on

average two or three days per week, staying at his father's home in his old room.

*Id*. at 1147-48. He further testified he maintained his voter registration in Moultrie

County at all times relevant to the matter. *Id*. at 1147.

[¶64.] That court held that "[t]he controlling inquiry in deciding the residence

of students, as with all others, is where 'does the party actually makes his home and

claim for the time to exercise the rights of property or citizenship incident to or

resulting from permanent residence?" *Id*. at 1151. When a person has two

residences, as did Baumgartner, the person

> [M]ust make a decision about which location he intends to make
> his permanent residence. Implicit in the residency requirement
> of intention to make a place a person's permanent home is the
> ability of that person to choose whether he wishes to exercise the
> rights afforded to a permanent resident in his new location or if
> he wishes to continue his residence at the home he has
> temporarily left. As long as he does not seek to "exercise the
> rights of property or of citizenship incident to or resulting from
> permanent residence" at his new location but instead continues
> to exercise those rights, including the right to vote, at his
> original location, he remains a resident at the original location.

*Id*. at 1151. As that court noted, charging a person with perjury for exercising his

choice and picking between his residences "imposes a chilling effect on running for

office." *Id.* at 1152. "If facts are present to allow a person to select between two locations, it is solely the individual's choice that determines where his or her residences actually is." *Id.*

[¶65.] In the instant case, Heinemeyer was temporarily absent from the North Egan apartment when at work or at his Wentworth residence. He was absent from the Wentworth home when present at work or while spending time at the North Egan apartment in Madison. Heinemeyer used both locations as residences, choosing to engage in some activities at one residence and other activities at the other. Among those activities Heinemeyer elected to engage in at the North Egan apartment, among many, was the decision to select North Egan in Madison as his voting residence over his residence in Wentworth. Heinemeyer has made no attempt to exercise voting rights based on his residence in Wentworth, nor has he attempted to register to vote under the Wentworth address. Heinemeyer admitted at trial that he obtained the apartment for the specific reason that he wanted to have a residence in Madison and remain as a registered voter. There is no evidence to contradict Heinemeyer's claimed intent to select the North Egan apartment in Madison as his voting residence, as Heinemeyer has done nothing inconsistent with his claimed intent.

[¶66.] The lead author's writing assumes that the "proper question is not where Heinemeyer intends his voting residence to be, but whether Heinemeyer has any present intention of leaving the home in Wentworth, where he *actually* lives." However, the lead author's writing has glossed over the fact that Heinemeyer actually lives at both addresses. His split of time between the two may be skewed

toward the Wentworth home, and the Madison apartment is certainly more modest in comparison. But neither of those two facts can alter the fact that Heinemeyer maintains both residences. The determining factor is not the amount of time or the number of amenities at any particular location. The determining factor to establish a voting residence from our case law, and from those jurisdictions that have considered the issue of selecting between two residences, is intent.

[¶67.] Thus, the proper question is: Where does Heinemeyer intend his voting residence to be? He has clearly announced his intention. Our constitution does not permit the courts to force a voter with two residences in two separate voting districts into one or another of those districts in contravention of a clear and unequivocal expression of the voter's intent. That choice belongs to the voter.

[¶68.] The effect of the Court's decision today is to disenfranchise thousands of voters who voted for Heinemeyer in this election. This was over sixty percent of the total votes cast. There is no claim by the Board of any irregularities either by the voters who cast their ballots for Heinemeyer or the officials who ran the election. At the end of the election process with the ballots counted, no one had any complaints about its legality. The people have spoken. However, the Court today sets a new standard for residency, or in the case of the concurrence a new standard for domicile, which in effect reverses the will of the majority of the Heartland voters. Apparently, because Heinemeyer did not sleep a sufficient number of nights in his apartment in Madison, the voters who cast their votes for him made a trip to the polls for naught. In the end their vote meant nothing. In a day when vast numbers of our citizens do not bother to vote because they think their vote does not

count, today's decision sends a chilling message reinforcing that unfortunate concept.

[¶69.]     The circuit court's order granting the writ of mandamus should be affirmed.

[¶70.]     MEIERHENRY, Justice, joins this dissent.